## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

TIMMY C.,

     Plaintiff,

v.

                                           CIVIL ACTION NO. 2:25-cv-00322

FRANK BISIGNANO,
Commissioner of Social Security,

     Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Timmy C. ("Claimant") seeks review of the final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. This matter was referred by standing order to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3). Presently pending before this Court are Claimant's *Brief* (ECF No. 7) and the Commissioner's *Brief in Support of Defendant's Decision* (ECF No. 8). Having fully considered the record and the parties' arguments, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 7), **GRANT** the Commissioner's request to affirm his decision (ECF No. 8), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A.    Information about Claimant and Procedural History of Claim

Claimant was 54 years old at the time of his alleged disability onset date and 57 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 24, 195).[1] He has a high school education, and past relevant work experience as a correction officer. (Tr. 42, 104). Claimant alleges he became disabled on January 8, 2021, due to the following impairments: injury to the left hand and arm; nerve damage; high cholesterol; diabetes; neuropathy, Vitamin-D deficiency; thyroid condition; and foot pain. (Tr. 100).

Claimant filed his application for Title II benefits (the "claim") on or about August 26, 2021. (Tr. 15). The Social Security Administration (the "Agency") denied the claim initially on January 31, 2022, and again upon reconsideration on October 27, 2022. (Tr. 100-112). Thereafter, on December 14, 2022, Claimant filed a written request for hearing. (Tr. 131-32). An administrative hearing was held before an ALJ on November 30, 2023. (Tr. 29-46). Subsequently on March 12, 2024, the ALJ entered an unfavorable decision. (Tr. 12-28). Claimant then sought review of the ALJ's decision by the Appeals Council on March 27, 2024. (Tr. 188-190). Ultimately the Appeals Council denied Claimant's request for review on March 21, 2025, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 1-7).

Claimant brought the present action on May 16, 2025, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed a transcript of the administrative proceedings on June 23, 2025. (ECF No. 6). Claimant subsequently filed his *Brief* on July 22, 2025. (ECF No. 7). In response, the Commissioner

---

[1] All references to "Tr." refer to the administrative *Transcript of Proceedings* filed at ECF No. 6.

filed his *Brief in Support of Defendant's Decision* on August 21, 2025. (ECF No. 8). Claimant then filed his *Reply Brief* on September 3, 2025. (ECF No. 9). Accordingly, this matter is now ripe for adjudication.

### B.    Relevant Evidence

The undersigned has considered all evidence of record pertaining to the parties' arguments, including the medical evidence, and summarizes the relevant portions here for the convenience of the United States District Judge.

### i.    Treatment Records

#### (a)    Claimant's Hand Treatment

On September 9, 2020, Claimant was evaluated by Luis Bolano, M.D., at Scott Orthopedic Center in Huntington, West Virginia. (Tr. 397). Claimant reported left-hand weakness with grip, as well as numbness and tingling, with an onset of approximately 6-7 months prior. *Id.* On examination, Dr. Bolano assessed entrapment of the left ulnar nerve as well as compression of the left radial nerve. (Tr. 398). Dr. Bolano ordered medical imaging to assess Claimant's condition. *Id.*

On October 29, 2020, Claimant followed up with Dr. Bolano (Tr. 394). Claimant reported continued left-hand weakness, tingling and numbness. *Id.* On examination, Dr. Bolano found weakness suggesting palsy or radial compression of the left radial nerve as well as positive signs of left-carpal-tunnel syndrome and entrapment of the left ulnar nerve. (Tr. 395). Dr. Bolano schedule Claimant for three surgical procedures: (1) left-carpal-tunnel release; (2) left-cubital-tunnel release; and (3) left-posterior-interosseous-nerve decompression. *Id.*

On January 12, 2021, Claimant underwent surgery of the left hand by Dr. Bolano. *Id.* Dr. Bolano's surgical notes indicate that Claimant "presented with typical chronic

carpal tunnel and cubital tunnel symptoms with intrinsic weakness and slight atrophy." (Tr. 401). Claimant "also had an unusual concomitant nerve palsy with a partial posterior interosseous nerve palsy with weak extension of the ring and small fingers with no evidence of tendon rupture and also generalized dorsal forearm muscle atrophy." *Id.* Dr. Bolano noted that the cause of Claimant's posterior interosseous nerve palsy "was unclear," and that medical imaging indicated "no mass . . . only the atrophic slightly fatty infiltrated proximal forearm muscles innervated by the posterior interosseous nerve." (Tr. 400-401). Claimant "did have intact wrist extension and thumb extension and thus there was some partial innervation." (Tr. 401). Dr. Bolano performed all three procedures—the cubital-tunnel release, carpal tunnel release, and posterior interosseous nerve decompression. *Id.* Claimant was released in stable condition with no complications. *Id.*

Claimant presented to Dr. Bolano on January 27, 2021, for clinical follow-up after his surgery. (Tr. 391). Claimant reported that his symptoms were "about the same," with no improvement and trouble with straightening his fingers. *Id.* Dr. Bolano applied "buddy loops" to Claimant's middle, ring, and little fingers of the left hand to treat his left-carpal-tunnel syndrome. (Tr. 392).

Claimant presented to Dr. Bolano on February 25, 2021, for clinical follow-up after his surgery. (Tr. 387). Claimant reported having no improvement, stating that he was still having problems straightening his fingers. *Id.* Dr. Bolano found that Claimant's left-carpal-tunnel syndrome had improved significantly, but that compression of the left-radial nerve had shown little improvement. (Tr. 388). Dr. Bolano recommended that Claimant "continue current therapy" and follow up in two months. *Id.*

Claimant followed up with Dr. Bolano on April 29, 2021. (Tr. 389). Claimant reported that his hand was "still numb [with] no improvements." *Id.* Dr. Bolano discussed

4

treatment of Claimant's compression of the left radial nerve and ultimately recommended waiting for three months for potential reinnervation to see if median/ulnar nerve function would return to normal. (Tr. 390).

Claimant presented to Dr. Bolano on July 29, 2021, for evaluation of his left cubital-tunnel release surgery. (Tr. 385). Claimant reported that the little finger and ring finger of his left hand was still numb with no improvements, as well as some pain and tingling and contracting of the left ring finger. *Id.* Dr. Bolano diagnosed compression of the left radial nerve, entrapment of the left ulnar nerve, and carpal tunnel syndrome of the left hand. (Tr. 386). Dr. Bolano recommended range-of-motion exercises. *Id.*

Claimant followed up with Dr. Bolano on November 1, 2021. (Tr. 416). Claimant reported numbness and weakness in the left hand, as well as trouble gripping, lifting, and buttoning. *Id.* Dr. Bolano assessed compression of the left radial nerve. (Tr. 417). He recommended that Claimant continue with his current therapy. *Id.*

On February 7, 2022, Claimant followed up with Dr. Bolano. (Tr. 418, 430). Claimant denied any pain but reported trouble straightening his hand, particularly the left ring finger and left little finger. *Id.* Dr. Bolano recommended tendon-transfer-reconstruction surgery to treat compression of the left radial nerve. (Tr. 419, 431).

On April 29, 2022, Claimant underwent surgery by Dr. Bolano to resolve pain caused by left-hand nerve entrapment and treat residual posterior interosseous nerve palsy. (Tr. 312, 421). At the conclusion of the procedure, Claimant was able to demonstrate full composite symmetric extension of all fingers. (Tr. 331). Dr. Bolano noted that Claimant "recovered full function of the index middle and little finger," but had "residual weakness and an extensor lag of the ring and small finger[.]" (Tr. 421). Overall,

Dr. Bolano noted that Claimant was functioning well. *Id.* Claimant was released in stable condition with no complications. (Tr. 422, 433-34).

Claimant followed up with Dr. Bolano on May 9, 2022. (Tr. 428). Claimant reported he was no longer experiencing pain. *Id.* On examination, Dr. Bolano noted that Claimant's surgical site was healing well. *Id.* Dr. Bolano removed the sutures and instructed Claimant on care and instructions of the surgical site. *Id.* He directed Claimant to follow up in three weeks. *Id.*

Claimant followed up with Dr. Bolano on June 2, 2022. (Tr. 426). Claimant reported that he was having "tightness/stiffness in the hand when making a fist," and that his finger would "try to catch/lock." *Id.* He also reported occasional pain, as well as pain in his shoulder blade and constant numbness in the left ring finger and left little finger. *Id.* Dr. Bolano recommended a home exercise program and directed Claimant to continue use of the post-operative splint for the next four weeks as needed. (Tr. 426-27).

Claimant followed up with Dr. Bolano on September 8, 2022, reporting that he "sometimes has pain from [the] elbow down into [the] hand . . . [with] numbness in [the] ring and small fingers[.]" (Tr. 424). Claimant reported the pain was worse at night. *Id.* On examination, Dr. Bolano found "improving" intrinsic function. *Id.* He recommended that Claimant continue on his current therapy and engage in activity as tolerated. (Tr. 425).

(b)    <u>Claimant's Foot Treatment</u>

Claimant presented to podiatrist David Nielson, DPM, on July 20, 2022, for a diabetic foot-care examination. (Tr. 440). Claimant reported that he had experienced numbness in both feet for a few years, with increased tingling when his blood glucose was high. (Tr. 440). On examination, Dr. Nielson found adequate range of motion in the joints as well as intact muscle strength. (Tr. 441). There was pain to palpation at the big toe in

Claimant's right foot, as well as a limited range of motion in the bilateral metatarsophalangeal joint and a decreased medial longitudinal arch. *Id.* Claimant performed a single-heel raise with difficulty. *Id.* Claimant's heel bone was tilted outward by four degrees from the vertical line, and the second toe was bent bilaterally. *Id.* X-ray imaging indicated arthritis in Claimant's feet. *Id.* Dr. Nielson assessed, *inter alia*, diabetic neuropathy, limited range-of-motion and stiffness in the joint connecting the big toe to the foot in the right side, and hammer toe. (Tr. 442). Dr. Nielson discussed diabetic foot care with Claimant, provided a toe splint, discussed shoe modification, and discussed treatment options. *Id.*

Claimant followed up with Dr. Nielson on September 19, 2022. (Tr. 444). On examination, Dr. Nielson noted slightly reduced arterial blood circulation in the feet, with no immediate signs of severe, critical limb ischemia. (Tr. 445). Dr. Nielson also noted nerve damage, with reduced proprioception and loss of sensation. *Id.* In the left foot, Dr. Nielson noted narrowing in the subtalar joint space, indicating arthritis. *Id.* In addition to his previous diagnoses, Dr. Nielson assessed flat foot with respect to Claimant's left foot. (Tr. 446). He discussed treatment options with Claimant and recommended following up regularly with a podiatrist for diabetic foot care. (Tr. 447).

Claimant followed up with Dr. Nielson on November 4, 2022. (Tr. 451). Claimant reported that his blood glucose is usually elevated, and that he continued to experience tingling and burning in his feet. *Id.* He also reported that his feet "feel like they are raw" and "sometimes . . . feel like they are swollen but they're not." *Id.* He reported that the pain was "about the same" but that "he has been exercising and . . . since start[ing] he feels a lot better." *Id.* On examination, Dr. Nielson's findings were largely the same. (*See* Tr. 452-53). He discussed prevention of skin fissuring with Claimant, prescribed a

hammertoe splint for the second toe of the left foot, and recommended that Claimant follow up in three months. (Tr. 453-54).

Claimant returned to his podiatrist, Dr. Nielson, for a foot examination on February 8, 2023. (Tr. 79). On examination, it was noted that sensations were diminished, but sensory and motor-testing performed was normal. *Id.* Claimant was assessed with neuropathy and hammer toe in the second toe of the left foot. *Id.* Claimant was instructed to keep his "blood sugars near target range" and to perform manual stretches of the extensor tendon for his hammer toe. *Id.*

Claimant returned to Dr. Nielson for diabetic foot care and evaluation of his neuropathy on May 8, 2023. (Tr. 81). Claimant reported that his feet "stay numb constantly" and at times "feel swollen and rough." *Id.* On examination, Dr. Nielson noted no musculoskeletal swelling or deformity; peripheral pulses were noted to be "2+ throughout." (Tr. 82). Dr. Nielson found that "sharp, dull, [and] light touch" were all "diminished" along with "proprioception" and "protective threshold[.]" *Id.* Claimant had a limited range of motion in the metatarsophalangeal joints bilaterally. (Tr. 82). Additionally, Claimant had a "[d]ecreased medial longitudinal arch" and performed a "[s]ingle heel raise with difficulty." *Id.* Dr. Nielson assessed diabetic neuropathy. (Tr. 83).

Claimant followed up with Dr. Nielson for diabetic foot care on July 10, 2023. (Tr. 84). Claimant reported that his last "A1c" test result was 7.2, and his last blood-glucose reading was about 157. *Id.* Claimant further reported that he "still gets abnormal sensation in [his] feet." *Id.* He denied having swollen joints, and no musculoskeletal swelling or deformity was noted. (Tr. 84-85). His examination results were largely the same as his previous appointment. (Tr. 85). Dr. Nielson assessed diabetic neuropathy and started Claimant on 150 mg of Lyrica medication. (Tr. 86).

8

Claimant followed up with Dr. Nielson for diabetic foot care on August 10, 2023. (Tr. 88). Claimant reported "abnormal sensations in both feet." *Id.* His examination results were largely the same as his previous appointment. (Tr. 90). Dr. Nielson assessed diabetic neuropathy and continued Claimant on the Lyrica medication, noting that Claimant was "tolerating [the] medicine well.". *Id.*

Claimant followed up with Dr. Nielson on September 12, 2023, regarding the bilateral neuropathy in his feet. (Tr. 92). Claimant reported that the Lyrica medication was not making a difference with his pain, which he described as "burning and numbness." *Id.* He described tingling and numbness in his feet. *Id.* His examination results were largely the same as his previous appointment. (Tr. 94). Dr. Nielson assessed neuropathy and increased Claimant's Lyrica prescription from 150 mg to 200 mg. *Id.*

Claimant followed up with Dr. Nielson on October 18, 2023, regarding his neuropathy. (Tr. 96). Claimant stated that the Lyrica medication "is helping" and that his feet were not feeling as swollen, though they were still feeling dry. *Id.* His examination results were largely the same as his previous appointments. (Tr. 97). Claimant reported that he continued to have elevated blood-glucose readings, though his "A1c" level had decreased to 6.4. (Tr. 96-98). Dr. Nielson assessed diabetic neuropathy and recommended capsaicin therapy be added to Claimant's treatment. (Tr. 98). He instructed Claimant to follow up in six months. (Tr. 99).

### ii.    Claimant's Hearing Testimony

At the November 30, 2023 administrative hearing before the ALJ, Claimant was represented by counsel and testified under oath. (Tr. 31, 33). Claimant testified that he is unable to work due to fatigue, post-surgery hand problems, numbness in two of his fingers, and problems with his feet. (Tr. 34). He experiences trouble sleeping as well as

high blood sugar. *Id.* Sometimes his feet feel like they are swelling but they are not. (Tr. 36). Due to neuropathy and foot pain, he can walk for a maximum of 15-20 minutes before needing to elevate his feet. (Tr. 35). He is able to stand for 20-30 minutes. (Tr. 36). He stays seated with his feet elevated for "roughly five or six hours a day, or better." *Id.* Elevating his feet is more comfortable, but ultimately does not relieve his symptoms. *Id.*

Claimant retired from his work as a correction officer after 24 years on the job. (Tr. 36). He did not return to work after having hand surgery due to loss of strength in his left hand, which is his dominant hand. (Tr. 36-37). His work as a correction officer required heavy lifting, but he estimates he is currently limited to lifting 30-40 pounds due to loss of strength. (Tr. 37). Two fingers of his left hand "stay numb" and he experiences periodic elbow pain. (Tr. 38). He has some dexterity in his fingertips, and can button a shirt. (Tr. 38). Claimant testified that his Metformin medication causes him to experience frequent diarrhea. (Tr. 38-39). Additionally, due to his impairments he relies on his brother to take care of his farm and bring in firewood. (Tr. 40).

### iii.    Vocational Expert Testimony

At the November 30, 2023 administrative hearing, the ALJ employed a vocational expert (the "VE") to aid in determining whether Claimant could perform his past relevant work, or other work. (Tr. 31-32). The VE classified Claimant's past relevant work "as a correction officer," a semi-skilled job that is generally performed at the medium level of exertion and actually performed at the heavy level of exertion. (Tr. 42). The ALJ next asked the VE to assume that a hypothetical individual had the same age, education, and work history as the Claimant, and was capable of performing work at the medium exertional level, with some additional limitations—namely, the hypothetical individual (1) could frequently climb ramps and stairs, balance, stoop, kneel, crouch, crawl, and finger,

10

handle, and feel with the left upper extremity; (2) could occasionally climb ladders, ropes, and scaffolds; (3) could tolerate occasional exposure to extreme cold, heat, and vibration; and (4) would need to avoid exposure to any workplace hazards, such as moving machinery or unprotected heights. *Id.* In response to the ALJ's hypothetical, the VE testified that the individual would be able to perform Claimant's past work as a correction officer. (Tr. 43). The ALJ then asked the VE to add a limitation requiring the hypothetical individual to "avoid exposure to any type of physical interaction or altercation, or physical interaction or altercations with an individual. (Tr. 43-44). In response, the VE testified that such a limitation would preclude Claimant's past work. (Tr. 44).

Next, the ALJ determined whether the hypothetical individual could perform other jobs in the national economy. *Id.* The VE testified that "medium-exertional jobs" would be available, including the representative occupations of warehouse worker, laundry laborer, and linen-room attendant—all unskilled positions with a specific vocational preparation ("SVP") of 2. *Id.* According to the VE, the warehouse-worker position had approximately 200,000 jobs in the national economy, the laundry-laborer position had approximately 60,000 jobs in the national economy, and the linen-room-attendant position had approximately 35,000 jobs in the national economy. *Id.*

Lastly, the ALJ turned to the issue of an employer's tolerance for off-task time—in particular, the need for additional breaks beyond those ordinarily provided by an employer. (Tr. 45). The VE opined that "10 percent is the maximum off-task time for any one work day . . . on a cumulative basis throughout the course of the day." *Id.*

### iv.    Consultative Evaluation

Claimant underwent a consultative examination by Nurse Practitioner Laura Cunnings, FNP-C ("NP Cunnings") on January 24, 2022. (Tr. 305-07). Claimant reported

high cholesterol as well as diabetes and a history of left-hand surgery. (Tr. 306). Claimant walked with a normal gait. *Id.* On examination, NP Cunnings noted that Claimant was able to walk on his heels and toes, able to perform a tandem gait and squat without difficulty, and demonstrated normal reflexes. (Tr. 307). However, Claimant had abnormal sensation, including "[d]iminished sensation in left 4th and 5th fingertip" as well as "[r]eported diminished sensation to [Claimant's] bilateral great toes." *Id.* NP Cunnings found that Claimant was able to get on and off the exam table without difficulty. *Id.* Finally, NP Cunnings found that Claimant's left grip was weaker than in his right hand; he was able to extend and oppose the fourth and fifth fingers of his right hand, though they did tend to contract; and he had diminished sensation to the left fourth and fifth fingertips as well as to his bilateral great toes. *Id.*

### v.   Administrative Findings

In January 2022, state-agency physician Eduardo Haim, M.D., reviewed Claimant's record at the initial level. (Tr. 104). Based upon Dr. Haim's opinion, the Agency made an initial determination finding that Claimant can lift/carry 50 pounds occasionally and 25 pounds frequently; can stand/walk for 6 hours and sit 6 hours in an 8-hour workday; and can frequently use both hands. (Tr. 102-03). State-agency physician Amy Wirts, M.D., reviewed Claimant's record on reconsideration, and the Agency adopted its initial findings on reconsideration based upon her opinion. (*See* Tr. 109-111).

### C.   Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. §

12

423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically-determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R.

§§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "h[is] ability to perform work despite h[is] limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R.

14

§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If he does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether he can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find him "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If he cannot perform other work, the ALJ will find him "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements of the Social Security Act and was insured through December 31, 2027. (Tr. 17). The ALJ further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of his disability. *Id.* Next, the ALJ found that the following of Claimant's asserted impairments constituted "severe" impairments: diabetes, peripheral neuropathy, carpal-tunnel syndrome, left-upper-extremity ulnar entrapment, status-post ulnar and radial release of the left upper extremity, and arthritis. *Id.*

Next, based upon these findings, the ALJ found that none of Claimant's impairments, or a combination thereof, met or medically equaled any of the impairments listed in the Social Security Administration's applicable regulations, at 20 C.F.R. Part 404,

Subpart P, Appendix 1. (Tr. 18). The ALJ assessed Claimant's RFC and determined that

Claimant has the ability to perform "medium" work as defined in 20 C.F.R. 404.1567(c),

with the following additional limitations:

> he can frequently climb ramps and stairs, but occasionally climb ladders, ropes, or scaffolds. He can frequently balance, stoop, kneel, crouch, and crawl. He can frequently finger, handle, and feel with the left upper extremity. He is capable of tolerating occasional exposure to extreme cold, heat, and vibration. He must avoid exposure to any workplace hazards such as moving machinery, unprotected heights, or physical interactions or altercations with other individuals as may have been encountered in prior past relevant work.

(Tr. 18-19).

The ALJ concluded that, given the limitations imposed by the Claimant's RFC, he

was unable to perform his past relevant work. (Tr. 22). The ALJ noted that Claimant was

"an individual closely approaching advanced age" on the disability-onset date, but

"subsequently changed age category to advanced age" during the administrative process.

*Id*. The ALJ further noted that Claimant "has at least a high school education" and that

"[t]ransferability of job skills [was] not material to the determination of disability." *Id*.

Because the ALJ determined that Claimant was unable to perform the full range of

medium work, he enlisted a VE to aid in ultimately finding that Claimant is capable of

working as a warehouse worker, laundry laborer, and linen-room attendant—jobs that

exist in significant numbers in the national economy. (Tr. 23). As a result, the ALJ

concluded that Claimant "has not been under a disability," and the claim for benefits was

denied. *Id*.

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to

deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by

substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    DISCUSSION

Claimant asserts a single allegation of error in this § 405(g) action: that the ALJ failed to properly consider Claimant's self-description of his limitations based on her reliance on the "objective" evidence. (ECF No. 7 at 9-10). The ALJ found that Claimant can perform "medium" work, with some limitations, as set forth in the RFC. (Tr. 17). Claimant points out that "medium work" is defined as work requiring, *inter alia*, "mostly standing/walking, or about 6 hours per 8 hour workday[.]" (ECF No. 7 at 2) (citing § 404.1567(c); SSR 83-10). Claimant argues that this finding is inconsistent with Claimant's "self-described limitations," because Claimant "described numbness, tingling, burning,

17

and sharp pain in his feet," as well as rawness and a swollen feeling at times, and testified that he spends at least 5-6 hours a day with his feet elevated. *Id.* at 7, 9.

Claimant argues that, like the Claimant in the Fourth Circuit's *Arakas* decision, "was entitled to rely exclusively on subjective evidence to prove that his symptoms were so continuous and severe that they prevented him from working a full eight-hour day," and therefore "the ALJ applied an incorrect legal standard in discrediting his complaints based on the lack of objective evidence corroborating them." (ECF No. 7 at 9) (citing *Arakas v. Commissioner*, 983 F.3d 83, 96 (4th Cir. 2020)). Claimant also highlights that the ALJ did not discuss Claimant's daily activities at all. Claimant argues that § 404.1529(c)(3) required such an analysis, and the ALJ's failure to find that any of Claimant's daily activities were inconsistent with his allegations regarding his limited ability to stand and walk constitutes error. (ECF No. 7 at 9).

Claimant also argues that remand is proper because the ALJ's finding that Claimant can meet the standing/walking requirements of medium work was not supported by sufficient explanation to permit judicial review. *Id.* at 10-11 (quoting *Arakas*, 983 F.3d at 95). While the state-agency physicians found that Claimant can stand/walk 6 hours in an 8-hour workday, Claimant notes that the ALJ "found this only partially persuasive" in her decision (Tr. 21). (ECF No. 7 at 10-11). The ALJ found that the state-agency physicians "failed to adequate[ly] consider the effects of the claimant's diabetic neuropathy and bilateral foot arthritis." (Tr. 21). The ALJ then stated that these conditions support restricting Claimant to frequent balancing, stooping, kneeling, crouching, crawling, and climbing stairs as well as occasional climbing of ladders/ropes/scaffolds. *Id.* Yet the ALJ adopted the state-agency physicians' opinions with respect to Claimant's ability to stand/walk. In light of the ALJ's partial rejection of

18

the state-agency physicians' opinions, Claimant argues that the ALJ did not sufficiently explain why she adopted their opinions with respect to Claimant's ability to stand/walk. *Id.* at 10.

Finally, Claimant argues that the alleged error is not harmless, because a finding that Claimant "cannot meet the standing/walking requirements of medium work" would result in a finding that Claimant is disabled "pursuant to the grid rules." *Id.* at 11. The "grid rules" are Agency regulations that direct findings of "disabled" or "not disabled" based upon vocational factors, such as age, education, and work experience, as well as a claimant's RFC determination. *Smith v. Comm'r of Soc. Sec. Admin.*, 678 F. Supp. 3d 1131, 1135 (D. Ariz. 2023). Based upon application of the grid rules, Claimant would meet the definition of "disabled" if the ALJ found that Claimant is limited to sedentary work and not able to perform his past work at the medium level of exertion in light of his age. (ECF No. 7 at 12; ECF No. 9 at 1-2).

In response, the Commissioner argues that substantial evidence supports the ALJ's determination that Claimant can perform a range of medium work. (ECF No. 8).

In his reply brief, Claimant reiterates his argument that "the ALJ never explained why [Claimant's] lower extremity neuropathy and arthritis—that he found the State Agency did not [adequately] account for—further impacted his ability to perform postural activities but not his ability to meet the stand/walk requirements of medium work." (ECF No. 9 at 2-3). Based upon Claimant's characterization of the ALJ's written decision, Claimant argues that the ALJ "failed to build an 'accurate and logical bridge' to explain the basis for finding that [Claimant's] lower extremity neuropathy and arthritis did not further restrict his ability to stand/walk." *Id.* at 2.

19

Having reviewed the record and considered the parties' arguments, the undersigned **FINDS** that the ALJ's decision is supported by substantial evidence, and Claimant's arguments are unavailing. First, Claimant's reliance on the Fourth Circuit's *Arakas* decision, 983 F.3d 83, is inapposite under the circumstances because Claimant takes that decision out of its unique context. In *Arakas*, the Fourth Circuit found that the ALJ's decision was "plagued by . . . many errors" including mischaracterizations of the evidence and a fundamental misunderstanding of that claimant's specific condition of fibromyalgia—a disorder with a "unique nature . . . whose symptoms are *entirely* subjective." *Arakas*, 983 F.3d at 96 n.4, 110 (emphasis added). Because "the nature of fibromyalgia itself renders . . . overemphasis upon objective findings inappropriate[,]" the Fourth Circuit found that the ALJ erred when "his opinion indicates that the lack of objective medical evidence was his chief, if not definitive, reason for discounting Arakas's complaints." *Id.* at 97.

Here, unlike the claimant's fibromyalgia condition in *Arakas*, the Claimant's impairments such as diabetic neuropathy and arthritis were not uniquely characterized solely by subjective symptoms. Nor did the ALJ mischaracterize the record like the ALJ in *Arakas*. Moreover, unlike *Arakas*, in the instant matter the lack of objective medical evidence was not the definitive reason for the ALJ's finding that Claimant was capable of performing work at the medium level of exertion. Certainly, "claims of disabling pain may not be rejected solely because the available objective evidence does not substantiate the claimant's statements as to the severity and persistence of [his or] her pain." *Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996). However, objective medical evidence and other objective evidence are "most certainly" crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs his or her ability to work. *Id.*

20

Although a claimant's allegations about her pain may not be discredited *solely* because they are not substantiated by objective evidence of the pain itself or its severity, "they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he or] she suffers." *Id*. The ALJ is simply required to consider the Claimant's statements about the intensity, persistence, and limiting effects of his symptoms, and to "evaluate [Claimant's] symptoms in relation to the objective medical evidence and other evidence[.]" *Id*.

Here, the ALJ did just that. She expressly considered Claimant's statements about his symptoms—including "the effects of the claimant's diabetic neuropathy and bilateral foot arthritis . . . [s]pecifically, his combined complaints of bilateral foot pain, numbness, tingling, and diminished foot sensation[.]" (Tr. 19-21). The ALJ also expressly considered Claimant's testimony that he is capable of walking for 10-15 minutes, standing for 20-30 minutes, and that he elevates his feet for approximately six hours each day. (Tr. 19). The ALJ evaluated those symptoms in relation to the objective medical evidence, such as records from Claimant's podiatrist indicating that Claimant "retained full strength in all extremities" on examination and evidence that Claimant maintained a normal gait, could walk on his heels and toes, and squat without difficulty. (*See* Tr. 20-22). The ALJ did not solely rely on this objective evidence, however, and went on to consider Claimant's subjective symptoms in relation to *other evidence*—including Claimant's own inconsistent statements. Specifically, the ALJ noted that Claimant "admitted exercising in November 2022 and feeling 'a lot better.'" (Tr. 20-21). She further noted that, "[d]uring subsequent physical examinations, the claimant reported ongoing numbness and tingling, *but denied having weakness*." (Tr. 21).

Claimant's challenge to the adequacy of the ALJ's explanation pursuant to *Arakas* is also unavailing. As set forth *supra*, Claimant pointed out that the ALJ "found that the State Agency's findings *did not adequately account* for [Claimant's] neuropathy and bilateral foot arthritis and as a result, found that additional postural limitations were warranted." (ECF No. 7 at 11) (citing Tr. 21). Claimant argued that the ALJ failed to sufficiently explain why she found that Claimant's lower extremity neuropathy and arthritis did not further restrict his ability to stand/walk than just limitations related to balance. *Id.*

Claimant's argument is not supported by the record. To the contrary, the ALJ clearly explained that the basis for his RFC restrictions was that, although Claimant had "complaints of bilateral foot pain, numbness, tingling, and diminished foot sensation," in contrast Claimant had "findings of normal gait and lower extremity strength[.]" (Tr. 21). Similarly, with respect to Claimant's daily activities, Claimant cannot point to any significant daily activity that the ALJ overlooked in evaluating Claimant's activity level. *See Warfield v. Astrue,* 1:08-cv-1516, 2010 WL 883652, at *4 (S.D. Ind. Mar. 4, 2010). The ALJ expressly considered Claimant's testimony that he elevates his feet for approximately 6 hours daily. (Tr. 19). In short, the ALJ created an accurate and logical bridge between the evidence and his conclusion that additional postural limitations greater than the State Agency findings were warranted except as to standing/walking— precisely what is required of the ALJ's explanation. *See Arakas*, 983 F.3d at 95. *See also Britt v. Saul*, 860 Fed. App'x 256, 262 (4th Cir. 2021) (unpublished) ("Meaningful review is frustrated—and remand necessary—only where [the Court is] unable to fathom the [ALJ's] rationale in relation to evidence in the record.").

22

At most, Claimant has demonstrated that he disagrees with the ALJ's weighing of conflicting evidence. However, in reviewing for substantial evidence, it is not the Court's province "to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Craig*, 76 F.3d at 589. Simply put, the ALJ's decision is supported by substantial evidence, and Claimant has failed to demonstrate error.

## IV.    RECOMMENDATION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 7), **GRANT** the Commissioner's request to affirm his decision (ECF No. 8), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Berger.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985);

*Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTERED:    February 20, 2026

Dwane L. Tinsley
United States Magistrate Judge

24